## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Oct 30 2015, 8:39 am
CLERK
of the supreme court,
court of appeals and
tax court

APPELLANT PRO SE

S.W.
Coldwater, Michigan

## IN THE
# COURT OF APPEALS OF INDIANA

S.W.,

*Appellant-Respondent,*

v.

A.W.,

*Appellee-Petitioner.*

October 30, 2015

Court of Appeals Case No. 02A04-1506-PO-571

Appeal from the Allen Circuit Court

The Honorable Everett E. Goshorn, Senior Judge

Trial Court Cause No. 02C01-1501-PO-245

**Kirsch, Judge.**

[1] Acting pro se, S.W. ("Father") appeals the trial court's denial of his motion to correct error, which challenged the issuance of an order for protection ("Protective Order") against him and in favor of A.W. ("Mother"). On appeal, Father raises one issue, which we revise and restate as whether the trial court

erred in denying his motion to correct error following its issuance of the Protective Order.

[2] We reverse.

## Facts and Procedural History

[3] Father and Mother were married in September 2004 and had four children during their marriage. The parents legally separated in October 2013 and, following a final dissolution hearing, the trial court issued its Decree of Dissolution of Marriage ("Decree") on January 2, 2015. As part of the Decree, the trial court found that it was in the best interest of the children, all of whom were under the age of nine years old, for the parents to retain joint legal custody, with Mother having primary physical custody of the children. At the time of the dissolution, Father lived in Coldwater, Michigan, and Mother lived in Fort Wayne, Indiana.

[4] The trial court recognized that Father had a non-traditional work schedule; consequently, the trial court granted Father mid-week, non-overnight parenting time with the children, required Father to furnish Mother with notice of his intent to exercise regular parenting time two weeks prior to the desired date of visitation, and ordered Father to furnish all transportation. The trial court noted that the deviation from Indiana's Parenting Time Guidelines ("Parenting Guidelines") was due to the distance between Father's Michigan residence and Mother's Indiana residence. The trial court also ordered that, pursuant to the Parenting Guidelines, "[B]oth parents shall attempt to resolve all future

disagreements concerning parenting time via discussion, including mediation, before seeking Court intervention." *Pet'r's Ex*. 1 at 27.[1]

[5] During the first month after the dissolution was final, Father and Mother communicated about parenting time, in large part, through text messaging. In those texts, Father complained that Mother was repeatedly denying him a reasonable opportunity to talk with his children by phone. On January 18, 2015, Father's text to Mother stated, "You are not letting speak [sic] with my kids again. Please have them call me!" *Id.* at 16. Mother apparently did not respond to this message. In his next text message, sent on January 27, 2015, Father said, "[I]t is almost 3 day [sic] that you have prevented me from talking with my kids. Have my kids call me in the morning before school!" *Id*. at 17. During the hearing, Mother testified that, on the morning of January 29, 2015, police came to her door in response to Father's request to check on the children's safety. The responding officer explained to Mother that it was police policy "to report to the house because there was not a protective order in place." *Tr. Vol. 1* at 8. Mother asserted that Father had "not texted [her] or left [her] a message on the 28th or the 29th asking if [the children] were okay or anything." *Id*. Mother testified that "[Father] just called and had the police sent to the house and obviously the kids were there and I came and filed a Protective Order for the constant texts and then that." *Id*.

---

[1] The Exhibit Volume is not numbered; therefore, we have counted the pages.

[6]     Mother's petition was filed pro se on January 29, 2015 and consisted of a form document that Mother completed. In her petition, Mother alleged, "I am filing this Petition for myself" because "I am or have been a victim of stalking."[2] *Appellant's App.* at 9. Choosing from a list of offenses, Mother alleged that Father "attempted to cause physical harm to me" and that Father "placed me in fear of physical harm." *Id.* at 10. Mother listed the incidents supporting her petition as having occurred on February 19, 2013, August 13, 2014,[3] and January 16, 2015. As to the first incident, Mother alleged that Father "pushed me from the bathroom to the bedroom. Yelling at me—telling me 'I will do what he says.'" *Id.* at 11. In connection with the August 13, 2014 incident, Mother alleged that Father sent her a picture via text message, "with what looked like blood on him," but he provided no follow-up explanation of the photo. *Id.* Finally, Mother described that, on January 16, 2015, Father "sent a text that he would not be getting the kids for his parenting time. He then came to the YMCA, none [sic] stop calling & texting all hours of the day—want to talk to him when he wa[nts] and now [sic]."[4] *Id.* Without citing to a specific

---

[2] On the form, Mother could have selected that she was filing the petition for one or more of the following reasons: (1) I am or have been a victim of domestic or family violence; (2) I am or have been a victim of a sex crime; (3) I am or have been a victim of stalking. Mother indicated only that she was a victim of stalking. *Appellant's App.* at 9.

[3] In her petition, Mother alleged that this incident occurred on "8-14." *Appellant's App.* at 11. However, during the hearing, Mother testified that she received the photograph via text on August 13, 2014. *Vol. 1 Tr.* at 6.

[4] Mother's handwritten petition is somewhat difficult to decipher; however we understand Mother's complaint to be that when Father wants to talk with the children, he wants to do it immediately. During the March 2015 evidentiary hearing, Mother did not provide any testimony about this incident.

incident, Mother also noted that Father blamed her for his January 14, 2015 arrest for federal healthcare fraud, adding, without explanation, that Father had asked the police to go to Mother's house on January 29, 2015. *Id*. at 11.

[7] A hearing on Mother's petition was held on March 9, 2015.[5] Both parties, acting pro se, testified at the hearing. When asked, Mother testified about all but one of the incidents alleged in the petition; in place of the January 2015 YMCA incident, Mother described an incident that occurred on October 4, 2014. On that day, Father came to a football game to watch the children play, and the parties planned to cash a joint check. *Tr. Vol. 1* at 6. Mother alleged that during the second game, Father took the youngest child from the field and locked her in Father's car, refusing to let her out when Mother asked. Mother complained that Father could not just take the children from the field because it was during her parenting time, and she "always need[s] to know where the kids are." *Id*. at 6-7.

[8] Father testified that he had never harassed Mother. He admitted having called the police on January 29, 2015, but said that he did so because he had not heard from his children for almost four days. *Id*. at 9. After Mother filed the petition, Father bought the children a cell phone so that he would not have to talk or text with Mother. When the trial court asked Mother why she did not let Father "talk to his kids," Mother stated that the kids could not use that phone because

---

[5] The judge who presided over the hearing on the order for protection was not the same judge who handled the dissolution proceeding.

it was missing a charger. *Id.* at 10. Father disagreed, noting that he had purchased a new cell phone for the children. Discussion ensued regarding the location of the charging cord, and the trial court determined that it was Father's responsibility to buy a new cord. *Id.* at 9-16.

[9] Following the hearing, the trial court granted the Protective Order on March 9, 2015. In that order, the trial court found:

> a. [Father] filed a timely Request for Hearing pursuant to Indiana Code [§] 34-26-5-10(a) . . . .
>
> b. N/A
>
> c. The Petitioner was present at the hearing and the Respondent was not present.[6]
>
> d. This order does not protect an intimate partner or child.
>
> e. N/A
>
> f. The Respondent represents a credible threat to the safety of the Petitioner or a member of the Petitioner's household.[7]

---

[6] The March 2015 order, mistakenly noted that Father was absent from the hearing. The correction, noting that Father was present at the hearing, was made in the trial court's May 5, 2015 order, which was issued in response to Father's motion to correct error. *Appellant's App.* at 8E-8H.

[7] Although the trial court made a finding that Father "represents a credible threat to the safety of the Petitioner *or a member of the Petitioner's household,*" Mother did not request an order for protection of the children. *Appellant's App.* at 8B, 8F (emphasis added). Instead, Mother's request was only for her own protection.

g. The Petitioner has shown, by a preponderance of the evidence, that domestic or family violence has occurred sufficient to justify the issuance of this Order.

h. The Respondent does not agree to the issuance of this order.

i. N/A

*Appellant's App.* at 8B. From these findings, the trial court entered the Protective Order: (1) enjoining Father "from threatening to commit acts of domestic or family violence or stalking against the Petitioner"; (2) prohibiting Father from "harassing, annoying, telephoning, contacting or directly or indirectly communicating with [Mother]" unless that communication was "to enable lawful visitation with the parties' minor children"; (3) excluding Father from Mother's residence; and (4) ordering Father to stay away from Mother's residence and place of employment. *Id*. at 8B-8C.

[10]     Father filed a motion to correct error asking the trial court to correctly note on the Protective Order that Father was present at the March 2015 hearing and, as to the rest of the Protective Order, contending that "none of this stuff is true, what [Mother] is alleging. I have proved that all the stuff was false." *Tr. Vol. 3* at 6. The trial court granted Father's motion only as to his presence at the hearing, but denied it in all other respects.[8] Father now appeals.

---

[8] Father also requested a change of judge, which the trial court denied.

## Discussion and Decision

[11]   Father contends that the trial court abused its discretion in denying his motion to correct error because there was insufficient evidence to support the issuance of the Protective Order. We begin by noting that Mother chose not to file an appellee's brief. When an appellee fails to file a brief, we apply a less stringent standard of review. *Deckard v. Deckard*, 841 N.E.2d 194, 199 (Ind. Ct. App. 2006). We are under no obligation to undertake the burden of developing an argument for the appellee. *Id*. We may, therefore, reverse the trial court if the appellant establishes prima facie error. *Id*. "Prima facie" is defined as "at first sight, on first appearance, or on the face of it." *Id*. Still, we are obligated to correctly apply the law to the facts in the record in order to determine whether reversal is required. *Mikel v. Johnston*, 907 N.E.2d 547, 550 n.3 (Ind. Ct. App. 2009).

[12]   We also recognize that, in his brief, Father cites to only one case, *Barger v. Barger*, 887 N.E.2d 990, 993 (Ind. Ct. App. 2008). That case, however, highlights the significant consequences that result when an order for protection is improperly granted. The *Barger* court said,

> We must also address the significant ramifications of an improperly granted protective order. For example, at the state level, violation of the trial court's protective order is "punishable by confinement in jail, prison, and/or a fine." [Ind. Code] § 34-26-5-3[c]. Furthermore, after the trial court has issued a protective order, it is a federal offense for a respondent to purchase, receive, or possess a firearm if the protected person is his current or former spouse; a current or former significant

other; or a person with whom the respondent has a child. 18 U.S.C. § 922(g). Thus, an improperly granted protective order may pose a considerable threat to the respondent's liberty.

*Id*. at 993-94.

[13] We review the denial of a motion to correct error for an abuse of discretion. *Kornelik v. Mittal Steel USA, Inc.*, 952 N.E.2d 320, 324 (Ind. Ct. App. 2011), *trans. denied*. An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Hawkins v. Cannon*, 826 N.E.2d 658, 661 (Ind. Ct. App. 2005), *trans. denied*.

[14] Pursuant to the Indiana Civil Protection Order Act ("CPOA"), "[a] person who is or has been a victim of domestic or family violence may file a petition for an order for protection against a: (1) family or household member who commits an act of domestic or family violence; or (2) person who has committed stalking under [Indiana Code section] 35-45-10-5 or a sex offense under [Indiana Code chapter] 35-42-4 against the petitioner." Ind. Code § 34-26-5-2(a). "Domestic or family violence," in pertinent part, means the occurrence of at least one of the following: (1) attempting to cause, threatening to cause, or causing physical harm to another family or household member; or (2) placing a family member in fear of physical harm. Ind. Code § 34-6-2-34.5. For purposes of Indiana Code chapter 34-26-5, "domestic and family violence also includes stalking (as defined in I[ndiana] C[ode section] 35-45-10-1) or a sex offense under I[ndiana]

C[ode chapter] 35-42-4, whether or not the stalking or sex offense is committed by a family or household member." Ind. Code § 34-6-2-34.5.

[15] The Indiana General Assembly has dictated that the CPOA "shall be construed to promote the: (1) protection and safety of all victims of domestic or family violence in a fair, prompt and effective manner; and (2) prevention of future domestic and family violence." *A.N. v. K.G.*, 10 N.E.3d 1270, 1271 (Ind. Ct. App. 2014) (citing Ind. Code § 34-26-5-1) (citation omitted). Generally, a trial court has discretion to issue an order for protection according to the terms of the CPOA. *Id*. (citing Ind. Code § 34-26-5-9(a)). "Thus, a finding by the trial court that domestic or family violence has occurred sufficient to justify the issuance of an order for protection means that the respondent represents a credible threat to the safety of the petitioner." *Id*. (citing I.C. § 34-26-5-9(f)). "Therefore, upon a showing of domestic or family violence by a preponderance of the evidence, the trial court 'shall grant relief necessary to bring about a cessation of the violence or the threat of violence.'" *Id*. (quoting I.C § 34-26-5-9(f)).

[16] Here, Mother requested an order for protection as to Father only for herself, but not for the children. Accordingly, Mother had to prove by a preponderance of the evidence that Father represents a credible threat to her and that an order for protection was necessary to bring about a cessation of the violence or the threat of violence. In seeking the Protective Order, Mother claimed that she had been "a victim of stalking." *Appellant's App*. at 9. During the March 2015 hearing, the trial court asked Mother why she "believed [she] need[ed] the further

protection of [the] Court." *Tr. Vol. 1* at 4. In response, Mother testified about Father: having pushed her out of the bathroom on February 19, 2013; having texted a photo of "himself with blood on him" on August 13, 2014, without any explanation; and having sent her "texts at all hours . . . about the kids and things." *Id.* For the first time, Mother also raised the October 4, 2014 incident, when Father allegedly took one of the children from the football field without telling Mother. *Id.* at 6-7. Finally, Mother explained that, on the morning of January 29, 2015, police came to her door in response to Father's request to check on the children's safety. The responding officer explained to Mother that it was "policy for [the police] to report to the house because there was not a protective order in place." *Id.* at 8. Mother asserted that Father had "not texted [her] or left [her] a message on the 28th or the 29th asking if [the children] were okay or anything." *Id.* Mother testified that "[Father] just called and had the police sent to the house and obviously the kids were there and I came and filed a Protective Order for the constant texts and then that." *Id.*

[17] Father asserts that the facts and evidence presented were insufficient to support the issuance of the Protective Order. As to the photograph, Father denied that the photograph he texted to Mother on August 13, 2014, showed there was blood on him. *Tr. Vol. 1* at 17. The trial court responded, "Well it is hard to tell, they are not the best pictures in the world. . . . And, I didn't see any [blood], but that doesn't mean it wasn't there. It doesn't mean it was there either." *Id.* at 18. "So, that is, neither proof of nor lack of proof of blood." *Id.* This was not evidence of violence, and Mother made no claim that Father was

threatening her by sending this photograph. As a matter of fact, Mother did not even respond to Father's text until the next day, saying, "Yes I will bring the kids . . . this Friday at 6 . . . . [A]fter that text you sent some pictures. . . . [A]re you well enough to get them?" *Pet'r's Ex.* 1 at 21. The evidence surrounding this August 2014 incident was insufficient for the trial court to finding that Father represents a credible threat to Mother's safety.

[18] During the March 2015 hearing, Father responded to Mother's claim that he sent her texts "at all hours," saying to the trial court, "Sorry, I do not see anything on [the texts] that is violent or derogatory in any way." *Vol. 1 Tr.* at 14-15. The trial court essentially agreed, stating, "Well I don't think she claimed that there was anything on there that was . . . of a questionable nature. I think it was the timing." *Id*. at 15. However, we discern nothing excessive or threatening about the timing or the content of the texts. They are relatively infrequent, cordial in nature, and are incidental to contact with the children and Father's exercise of visitation rights consistent with the Parenting Guidelines. This evidence was insufficient for the trial court to find that, based on the content, frequency, or timing of these texts, Father represents a credible threat to Mother's safety.

[19] Mother makes no claim regarding how Father posed a credible threat to her safety when he took their youngest daughter from the football field and placed her in his car. Mother did not testify that she felt threatened by Father during this encounter or that she feared he would harm her; instead she merely said, "I was trying [to] state that it was my parenting weekend and it was fine for them

to visit, but I always need to know where the kids are and he can't take them from the field." *Vol. 1 Tr.* at 6-7. The evidence surrounding this October 2014 incident was insufficient to support the trial court's finding that Father represents a credible threat to Mother's safety.

[20] In her petition, Mother suggested that she was fearful of Father because he blamed her for his arrest on federal fraud charges. To this, Mother added, "He called police on me on 1-29-15." *Appellant's App.* at 11. Mother's own explanation of the circumstances surrounding Father's January 29, 2015 call to the police, however, undermines her claim that Father's actions were in any way threatening. During the evidentiary hearing, Mother explained that, on the morning of January 29, 2015, police came to her door in response to Father's request to check on the children's safety.[9] *Vol. 1 Tr.* at 8. The responding officer explained to Mother that it was "policy for them to report to the house because there was not a protective order in place." *Id.* at 8. Mother asserted that Father had "not texted [her] or left [her] a message on the 28th or the 29th asking if [the children] were okay or anything." *Id.* Mother testified that "[Father] just called and had the police sent to the house and obviously the kids were there and I came and filed a Protective Order for the constant texts and then that." *Id.* Again, the evidence surrounding the incident of Father calling

---

[9] Mother stated to the trial court, "I am also a witness in a federal case against [Father]. At his preliminary hearing on February 17th, 2015, [the judge] . . . stated that he was not able to leave Michigan unless it was to exercise his parenting time, . . . and he was not to have contact with me unless it was regard [sic] to his children or visitation." *Vol 1. Tr.* at 8. Mother made no claim how this charge made Father a threat to Mother's safety.

police is insufficient for the trial court to find that Father represents a credible threat to Mother's safety.

[21]     Finally, during the March 2015 hearing, the trial court cited to the February 2013 incident as support for issuing the Protective Order, referring to it as "the act of violence back a couple of years ago where you pushed her around." *Vol. 1 Tr.* at 11.  Father responded that the incident never happened.  The trial court summarily responded, "[S]he claims it did." *Id.*  Without further explanation as to how the February 2013 incident warranted an order for protection, the trial court bolstered its position to issue the Protective Order by stating, "and some perhaps some excessive or unnecessary texting at times when the kids aren't available." *Id.*  The trial court confirmed that the Protective Order did not prevent Father from exercising parenting time with his children.  "That is not going to change, but um, and I am concerned about . . . to what happened to the charger for the phone." *Vol. 1 Tr.* at 11.  Thereafter, the parties and the court extensively discussed the missing phone charging cord.

[22]     At the close of the evidentiary hearing, the trial court explained the imposition of the Protective Order, stating "the primary thing" is the one "incident a couple of years ago of physical contact that was unnecessary and inappropriate. That plus . . . the ongoing issues that the two (2) of you have warrant this." *Id.* at 18.  Concluding, the trial court said, "But, this is just a means of having a Court Order in place telling the two (2) of you to go to your neutral corners and uh basically act like civil human beings toward each other and for the sake of the children and for that reason only." *Id.*  In that regard, however, we find

that the trial court misinterpreted or misapplied the law when it granted the Protective Order. The Indiana General Assembly has dictated that the CPOA "shall be construed to promote the: (1) protection and safety of all victims of domestic or family violence in a fair, prompt and effective manner; and (2) prevention of future domestic and family violence." *A.N.*, 10 N.E.3d at 1271 (citing Ind. Code § 34-26-5-1). As we observed, there are significant ramifications to the issuance of an order for protection. Accordingly, an order for protection should not be granted for the mere purpose of directing parties to "go to [their] neutral corners." *Vol. 1 Tr.* at 18.

[23] Here, the evidence was insufficient to support a finding that Father had committed domestic violence or stalking or that he represented a credible threat to Mother's safety. The evidence showed that the only physical contact between Father and Mother occurred in February 2013, eight months before Mother filed to dissolve the marriage, when Father pushed Mother out of their bathroom. Since that time, the text messages between the parties have been civil, non-threatening, and only pertained to parenting time issues. Further, Father lives in Michigan, and Mother lives in Indiana, and the only visits Father has made to Indiana have been in connection with exercising his parenting time. Accordingly, there was insufficient evidence to sustain the Protective Order. The trial court abused its discretion when it denied Father's motion to correct error. We reverse.

Najam, J., and Barnes, J., concur.